Paul William SCOTT, Petitioner,

v.

Richard L. DUGGER, Respondent.

No. 83–8293–Civ.

United States District Court,
S.D. Florida.

May 26, 1988.

Paul Morris, Coral Gables, Fla., for petitioner.

Richard Bartmon, West Palm Beach, Fla., for respondent.

ARONOVITZ, District Judge.

THIS CAUSE came before the Court upon the petitioner's, Paul William Scott, petition for writ of habeas corpus, an amended petition, and his motion to amend the amended petition to add an *Adams* [*] claim. THE COURT has received successive memoranda of law from both parties, held numerous hearings in this matter, most recently holding two oral arguments on the issues raised in the amended petition, has considered the petition and the record, and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that the petition and amended petition be and the same are hereby DENIED, and this action is DISMISSED. Furthermore, the petitioner's motion to amend the amended petition to add an *Adams* claim is hereby DENIED.

[*] *Adams v. Dugger*, 804 F.2d 1526 (11th Cir.1986), *amended on reh'g*, 816 F.2d 1493 (11th Cir. 1987), *cert. granted*, — U.S. —, 108 S.Ct. 1106, 99 L.Ed.2d 267 (1988). Subsequent to the *Adams* case, the Eleventh Circuit has decided two en banc opinions on the issues addressed in *Adams*. *See Harich v. Dugger*, 844 F.2d 1464 (11th Cir.1988) (en banc); *Mann v. Dugger*, 844 F.2d 1446 (11th Cir.1988) (en banc).

No basis for federal habeas relief has been established as to any issue raised by Scott in this amended petition. Consequently, the stay of execution previously entered by the Court on January 10, 1984 be, and the same is, hereby LIFTED, effective 10 days from the date of this Order.

This opinion contains six major sections. The first is "Factual Background," which begins below. Second is "Procedural Background," beginning *infra* at page 1495. Third is "Exhaustion and Procedural Default," beginning *infra* at page 1496. Fourth is "Application of Procedural Bar Analysis," beginning *infra* at page 1498. Fifth is "Conviction Claims," beginning *infra* at page 1500. Sixth is "Sentencing Claims," beginning *infra* at page 1508.

## I. Factual Background

Paul William Scott is under sentence of death for the murder of James Alessi in December, 1978. The jury returned a general verdict of guilty after being instructed on both premeditated murder and felony murder. After the jury recommended the death penalty, the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, issued its written findings of fact and imposed a sentence of death.

The Circuit Court's sentencing order contains certain factual findings relevant to the manner of Alessi's murder. In addition, the Supreme Court of Florida has reviewed this case on three different occasions, therein making numerous factual findings based on the trial record. Scott only takes exception to certain findings relating to whether Scott himself committed Alessi's murder with premeditation. Otherwise, Scott does not challenge or contest the Florida's description of the murder scene and other relevant factors, and this Court will rely upon these findings to present the circumstances of Alessi's murder. *See Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986).

On the evening of Alessi's murder, Scott and Richard Kondian, his friend and coperpetrator, told Charles Soutullo of their plan to rob and murder Alessi. Scott and Kondian also asked Soutullo to join them in their plan, but Soutullo declined the offer. The jury was apprised as to Soutullo's reputation for dishonesty and his past crimes, including several felony arrests and convictions. Alessi picked up Scott and Kondian in the late evening, and the three drove to Alessi's father's house where they borrowed a patio umbrella and a station wagon. The umbrella was later found in Alessi's yard.

The next morning Alessi's nude body was found in his home, his hands and feet tightly bound with electrical cord and telephone wire. Medical evidence indicated that Alessi was still alive when he was tied up. Alessi had received six blows to the head with a blunt instrument, one of which caused a compressed fracture of his skull. The entire house showed clear signs of a violent struggle which moved from room to room. Scott's fingerprints were found on various items in the house, including a knife used to cut the cords with which Alessi was bound, and on the neck of a broken vase.

After the murder, Scott and Kondian used a key to enter Alessi's flower and jewelry shop, taking most of the gold in the shop. They also stole Alessi's automobile. About one month later, Scott was arrested in Sacramento, California. In his hotel room, police found a golden bear charm, similar to charms which Alessi owned, one of which Alessi wore and another one which was in Alessi's shop.

In addition to the testimony at trial, the record contains testimony Scott gave before the Florida Probation and Parole Commission on his clemency application. In this testimony, Scott admitted that he and Kondian went to Alessi's home in order to rob him. Kondian distracted Alessi by having sex with him on the couch while Scott searched for items to steal. After a fight erupted between Alessi and Kondian, Scott interceded by breaking a vase over Alessi's head. Although Kondian was smashing a paperweight against Alessi's's head, Alessi gained the upper hand and began to win the fight. Scott then smashed a chair across Alessi's back, knocking him to the ground. Scott cut cords with a knife and tied Alessi to a chair. But he says that after Kondian again began to beat Alessi

after he was tied up, Scott ran out the back patio door.

## II. Procedural Background

Scott challenges both his conviction and sentence through this habeas petition. Scott filed this petition on June 3, 1983, after the Supreme Court of Florida had already affirmed his conviction and sentence both on direct appeal, and subsequently, in a state habeas corpus petition. *See Scott v. Wainwright*, 433 So.2d 974 (Fla.1983); and *Scott v. State*, 411 So.2d 866 (Fla.1982). The State of Florida had scheduled Scott's execution on June 7, 1983, but this Court entered a stay of execution on the same day Scott filed this petition. The next day, on June 8, 1983 Scott filed an amended petition for writ of habeas corpus. The original petition raised 29 discrete issues and the recent amendment added two others.

The respondent had moved to dismiss the amended petition on the grounds that it presented a mixed petition containing both exhausted and unexhausted claims under *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). The Court rejected this motion on August 29, 1983, holding that Scott had exhausted all claims raised in his amended petition, including certain claims which he had raised in his Florida habeas petition as forming the basis of his claim of ineffective assistance of appellate counsel.

This case proceeded on its merits, but on December 8, 1983 Scott filed a motion for leave to amend/supplement petition for writ of habeas corpus. This was only four days before the Court held what was noticed as the final hearing in this matter. Relying on the claims raised in this supplemental motion, on December 21, 1983 Scott moved at the final hearing to hold this case in abeyance pending his presentment to the Florida courts of admittedly unexhausted claims.

On January 10, 1984, the Court entered an order staying these proceedings, without objection from the state, which required the petitioner to present to the state courts "each and every and all claims not previously heretofore presented to the Florida state courts." The Court granted

Scott's motion because it found—and the state agreed—that Scott had not previously raised certain claims raised in his supplemental motion to amend the petition filed December 8, 1983.

By ordering the petitioner to present all claims to the Florida courts, the Court specifically advised and warned Scott that "[a]ny such claims not so presented shall be deemed to have been waived." By its terms, the Court's Order did not only apply to those particular claims which the Court found to have been unexhausted, but instead required the petitioner to present all unexhausted claims during the stay, whether or not raised in his amended petition. Pursuant to the Court's stay order, the petitioner did return to the Florida courts. On July 23, 1986, the Circuit Court Judge rejected his motion to vacate judgment and/or sentence. The Supreme Court of Florida affirmed this order on August 20, 1987. *Scott v. State*, 513 So.2d 653 (Fla. 1987).

Scott filed a further amendment to his amended petition in this Court on December 11, 1987 which raised two additional claims. The first was that Scott's trial counsel was constitutionally ineffective, and the second was that the Supreme Court of Florida itself denied Scott Due Process of law by considering extra-record materials. The state filed its response to this amendment on December 31, 1987. On February 19, 1988, the Court held oral argument on the petition as it stood in its final form, including all amendments and supplements.

At the February 19, 1988 hearing, the Court identified several matters of particular interest and allowed the parties to file supplemental memoranda of law, but only the state filed such a supplement on March 7, 1988. On March 18, 1988 Scott filed a motion to stay these proceedings and present to the Florida courts a constitutional claim previously unexhausted and not contained in his amended petition. He based this request on the Supreme Court's decision to review the case of *Adams v. Dugger*, 804 F.2d 1526 (11th Cir.1986), *amended on reh'g*, 816 F.2d 1493 (11th

Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1106, 99 L.Ed.2d 267 (1988).

In *Adams,* the court held that a habeas petitioner was not procedurally barred from a pursuing a claim under *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), because *Caldwell* was a novel change in the law which was unavailable at the time of the petitioner's direct appeal. In *Caldwell,* the Court held that a prosecutor's argument, which led the jury to believe that responsibility for determining the appropriateness of the death sentence rested elsewhere, violated the Eighth Amendment.

This Court rejected Scott's motion on April 5, 1988. The United States Supreme Court had issued the *Caldwell* opinion over a year *before* the state Circuit Court denied Scott's request to vacate judgment and/or sentence, and over two years *before* the Supreme Court of Florida issued its opinion affirming the Circuit Court. The *Caldwell* decision was decided on June 11, 1985, the Circuit Court Order was entered on July 23, 1986, and the Supreme Court of Florida affirmed on August 20, 1987. This timing sequence is critical because the petitioner was required pursuant to the Court's stay order to present all unexhausted claims to the state courts, yet he admittedly failed to present a *Caldwell* claim in his then-pending state proceedings.

This Court concluded that a *Caldwell* claim was clearly available to Scott well before the Circuit Court rendered its opinion, and that even *Adams* itself was available during the pendency on the Court's stay. The Eleventh Circuit decided *Adams* after the Circuit Court order but *before* the Supreme Court of Florida's affirmance. Consequently, even if *Adams* truly worked a substantial modification of *Caldwell,* the petitioner could have moved the Supreme Court of Florida to allow him to present an *Adams* claim before the Circuit Court. By failing to do so, the petitioner violated the Court's stay order.

Consequently, the Court enforced its previous ruling that any such unexhausted claims "shall be deemed to have been waived," and on April 5, 1988 denied Scott's motion to exhaust an *Adams* claim

and for a stay. Finally, Scott moved on April 11, 1988 for leave to amend *this* petition in order to raise the *Adams* issue herein on the grounds that exhaustion of state remedies would be futile.

The Court held final oral argument on April 15, 1988, and the focus of this hearing was on the matters raised in the respondent's supplemental memorandum. Scott, of course, did not waive or abandon any claims or matters raised in his amended petition, even though he did not file a supplemental memorandum other than his motion to exhaust an *Adams* claim. The Court acknowledged that it did not consider any of petitioner's claims to have been waived simply because Scott declined the Court's invitation to file a supplemental memorandum.

### III. Exhaustion and Procedural Default

■ The fundamental requirement that a federal habeas petitioner first exhaust and preserve his constitutional claims in the state courts requires a careful and detailed examination of the record. The object of this examination is to determine which of the claims in the federal petition are properly preserved for adjudication on their merits, and which, if any, are procedurally barred from being considered on the merits. As this is a threshold issue common to all the claims raised herein, it is helpful to provide a general overview and application of the procedural default doctrine before turning to the claims seriatim.

■ A petitioner exhausts federal constitutional claims by fairly presenting them to the state courts before bringing his federal petition for writ of habeas corpus. *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Where a federal petition contains both exhausted and unexhausted claims, the court must dismiss the petition. *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Because exhaustion is a prerequisite to a federal habeas petition, it would follow that the state courts must first have either addressed each claim on the merits or de-

clined to reach its merits by invoking the doctrine of procedural default.

Given this dichotomy, it would appear that a federal court could only invoke procedural bar where the state courts have themselves already done so, because "[w]here ... the state court might have invoked a procedural bar but has provided no indication that it did so, 'a federal court must address the merits' of the petitioner's claim." *Oliver v. Wainwright,* 795 F.2d 1524, 1528–29 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1380, 94 L.Ed.2d 694 (1987). If the state court does not "indicate that a federal constitutional claim is barred by some state procedural rule, a federal court implies no disrespect for the State by entertaining the claim." *County Court of Ulster County, New York v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

■ But in fact, there is no illogic to the result that a federal habeas court can entertain a petition containing claims which the state courts have not passed upon, either on the merits or by invocation of procedural bar. The requirement that a petitioner exhaust state remedies "refers only to remedies still *available* at the time of the federal petition." *Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 1570, n. 28, 71 L.Ed.2d 783 (emphasis added). Where a defendant has failed to preserve error in the state courts and state court collateral relief is unavailable at the time of the federal petition, any claims he might have raised are considered both exhausted and procedurally barred. *Id.* at 125–130, 102 S.Ct. at 1570–1573.

A federal habeas court can therefore invoke procedural bar although the state courts have not themselves been offered the opportunity to consider the claim, let alone to invoke procedural bar. "[T]he considerations of comity that underlie the procedural bar doctrine require federal habeas courts to honor state procedural rules, and not only state courts' procedural rulings." *Lindsey v. Smith,* 820 F.2d 1137, 1143 (11th Cir.1987). *See also Smith v. Dugger,* 840 F.2d 787 (11th Cir.1988).

■ In sum, a federal habeas court can invoke the doctrine of procedural bar where the state courts have themselves refused to address the merits due to a procedural default, or where the petitioner has failed to raise a claim in state court which would be procedurally barred as of the time of the federal petition. In either case, the federal court must honor the procedural bar absent the petitioner's demonstration of cause and prejudice for the procedural default. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

In *Sykes,* the Supreme Court found that the petitioner's failure to make a contemporaneous objection to the admission of his confession at trial barred the federal courts from considering his argument that he had not understood his *Miranda* rights. Procedural bar also applies to a petitioner's failure to have raised a matter on direct appeal of his conviction and sentence. *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Finally, it applies to matters which a "state habeas court refused to hear because the petitioner did not present it seasonably to that court." *Presnell v. Kemp,* 835 F.2d 1567 (11th Cir. 1988).

■ A petitioner may establish cause for a particular procedural default by showing "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray,* 106 S.Ct. at 2646. "Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, ... or that 'some interference by officials' ... made compliance impracticable, would constitute cause under this standard." *Id.*

■ In addition, constitutionally ineffective assistance of counsel is a cause for procedural default. *Id.* But "[s]o long as a defendant is represented by counsel whose performance is not constitutionally ineffective [there is] no inequity in requiring him to bear the risk of attorney error that results in procedural default." *Id.* at 2645–46. Yet the exhaustion requirement "generally requires that a claim of ineffec-

tive assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Id.* at 2646.

## IV. Application of Procedural Bar Analysis

This overview of the relationship between exhaustion of available state remedies and the doctrine of procedural bar now sets the stage for an initial analysis of which claims in Scott's amended petition are viable. Because the Florida courts only affirmatively invoked procedural bar with respect to Scott's application for writ of error coram nobis, the doctrine is centrally relevant in this case to any claims contained in the federal petition which Scott never presented to the Florida courts. *See Scott v. Wainwright,* 433 So.2d 974 (Fla.1983). In addition, it is relevant to his pending motion to amend the petition to add an *Adams* claim.

"When the State answers a habeas corpus petition, it has a duty to advise the District Court whether the prisoner has, in fact, exhausted all available state remedies." *Granberry v. Greer,* — U.S. —, —, 107 S.Ct. 1671, 1675, 95 L.Ed.2d 119 (1987). Although the respondent had originally contended that only ten claims were exhausted, at the oral argument on his motion to dismiss he conceded that the only arguably unexhausted claims were those which Scott raised only as forming the basis of his ineffective assistance of appellate counsel claim. Consequently, this group of claims presents the greatest issue with respect to procedural preservation.

The Supreme Court of Florida rejected Scott's petition for writ of habeas corpus on June 3, 1983. Scott had argued that his appellate counsel was ineffective for failing to raise a number of alleged errors at trial. While he did argue that the failure to raise these alleged errors demonstrated appellate counsel's ineffectiveness, he did not directly raise each of these claims individually and on their merits, apart from forming the basis of his ineffectiveness claim. The respondent argued that these particular claims were not "fairly presented" to the Supreme Court of Florida on their mer-

its, and that they were therefore unexhausted.

The Court, however, rejected the respondent's argument that these particular claims were unexhausted on their merits, due to the approach the Supreme Court of Florida took to dispose of Scott's ineffective assistance of appellate counsel claim. "We find that none of the arguments now made by Scott would have constituted reversible error had they been raised on direct appeal. In fact, most of these claims would have been frivolous." *Scott v. Wainwright,* 433 So.2d 974, 975 (Fla.1983).

The Court concluded that the merits of each of these claims was exhausted because the state court itself chose to address the merits, and because "the underlying facts were presented and argument regarding a federal constitutional violation made." Alternatively, the Court ruled that given the Supreme Court of Florida's dim view of the merits of these underlying claims, a return to the state courts to address these matters would be futile. *See Howard v. Davis,* 815 F.2d 1429 (11th Cir. 1987), *cert. denied,* — U.S. —, 108 S.Ct. 184, 98 L.Ed.2d 136 (1987).

The Supreme Court of Florida cited these alleged errors in the footnote to its opinion, and Scott has raised most of these claims on the merits in this petition. *See Scott,* 433 So.2d at 975 n.*. The un-appealed alleged *trial* court errors which Scott now raises are: (1) precluding defense counsel from making an opening statement; (2) allowing the state's "surprise" presentation of Richard Kondian during trial; (3) precluding cross-examination of the witness who identified Kondian; (4) finding non-statutory aggravating circumstances in sentencing; (5) allowing the state to cross-examine psychologist Brad Fisher; (6) denying a motion for mistrial following a witness referring to Scott as an inmate; and (7) overruling trial counsel's objection to the prosecutor's remarks regarding Soutullo's cooperation with the police.

Having concluded in the August 29, 1983 Order that Scott had exhausted the merits of these claims, the question now presented is whether Scott has procedurally defaulted

on them. The respondent specifically argues in his supplemental brief dated March 7, 1988 that Scott has defaulted on his claim that the trial court improperly considered non-statutory aggravating circumstances. As this claim arose in the context of Scott's ineffective assistance of appellate counsel claim in his state habeas petition, resolution of the state's procedural default challenge to this claim necessarily encompasses the other claims which formed the basis of the ineffectiveness challenge.

Under *Oliver,* a petitioner does not procedurally default where the state courts reach the merits even though they conceivably could have invoked procedural bar. When "the state courts have not relied exclusively upon [petitioner's] procedural default *Wainwright v. Sykes* does not prevent federal habeas review." *Thompson v. Estelle,* 642 F.2d 996, 998 (5th Cir.1981). Under *Lindsey,* a petitioner procedurally defaults when he has failed to raise a claim in state court which is barred at the time of the federal petition.

The question presented is whether the Supreme Court of Florida's disposition of Scott's claims underlying his ineffective assistance of appellate counsel claim place these claims in the *Oliver* category or the *Lindsey* category. But as *Lindsey* default is predicated upon a finding that the petitioner has not fairly presented his claims to the state courts, the Court's earlier ruling that Scott has in fact exhausted these claims necessarily means that *Lindsey* default is inapplicable.

The procedural status of the merits of Scott's claims underlying his ineffectiveness claim are more analogous to *Oliver* and *Thompson,* where the state courts chose to address the merits of the petitioner's constitutional claims although they could have refused to do so under the procedural bar doctrine. The difference, arguably, is that the decisions of those state courts to reach the merits was perhaps more deliberate than the summary reference made by the Supreme Court of Florida. But the Supreme Court of Florida unmistakably stated that it would have rejected each of these claims if raised on direct appeal, and even went on to label most of them "frivolous."

Certainly where a state court chooses to voice an opinion on the merits that a federal constitutional claim is frivolous, the Court cannot be prevented from making its own assessment on the merits. Where a state court chooses *sua sponte* to address a constitutional claim, federal court habeas review is proper unless the state court has clearly and expressly rested its decision on independent and adequate state law grounds. *Caldwell v. Mississippi,* 472 U.S. 320, 327–328, 105 S.Ct. 2633, 2638–39, 86 L.Ed.2d 231 (1985) (relying upon *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)).

Perhaps the closest analogy on point is the case of *Francis v. Spraggins,* 720 F.2d 1190 (11th Cir.1983), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985). In *Francis,* the court held that the petitioner had exhausted a claim that trial counsel was ineffective in closing argument at the guilt/innocence phase, although the petitioner had not raised that specific basis for ineffectiveness during his state court postconviction relief proceedings. He had, however, identified eleven other separate incidents of alleged trial counsel error. The Eleventh Circuit concluded that "where the petitioner calls the state court's attention to ineffective assistance problems and the court examines the crucial aspect of counsel's representation ... the petitioner may relitigate the constitutional claim in federal court." *Francis,* 720 F.2d at 1193.

The *Francis* court used a flexible and realistic framework to determine what matters were exhausted in the petitioner's ineffective assistance of counsel claim in state court. While the court only found other specific claims of ineffective assistance to be exhausted, it is no great leap to conclude, as the Court did in denying the respondent's motion to dismiss, that the merits of the alleged trial court errors have been fairly presented to the Florida courts. Interestingly, the *Francis* court also reviewed the district court's finding that the petitioner had exhausted state remedies un-

der the clearly erroneous standard of review. 720 F.2d at 1192.

■ Finally, the Court's determination that none of these claims is procedurally barred is buttressed by the obvious unfairness to Scott of a contrary holding. When the Court stayed these proceedings in 1984, it instructed Scott to present all unexhausted claims to the Florida courts. But the Court had already ruled, of course, that the merits of the alleged trial court errors underlying the ineffectiveness claim were exhausted.

Given the Court's expressed judgment on their exhaustion, Scott clearly cannot be faulted for not attempting to raise these claims in his Fla. Rule of Crim.Pro. 3.850 proceedings following the Court's stay Order. Thus, even assuming for the sake of argument that the Court was in error in its earlier judgment that these claims had been exhausted, Scott should not now be prejudiced by relying upon the Court's previous ruling. In fact, the Florida courts might very well have considered these claims on their merits if Scott had presented them in his Rule 3.850 proceedings.[1] The Supreme Court of Florida's habeas opinion, however, certainly indicates that it would have rejected these claims.

■ Finally, Scott has moved to amend the petition to add a claim under *Adams v. Wainwright*, 804 F.2d 1526 (11th Cir.1986), *modified on reh'g*, 816 F.2d 1493 (11th Cir.1987), *cert. granted*, — U.S. ——, 108 S.Ct. 1106, 99 L.Ed.2d 267 (1988). The respondent objects to this motion on the ground that Scott is procedurally barred from bringing an *Adams* claim. Indeed, in its earlier Order Denying Motion for Leave to Exhaust *Adams* Claim in State Courts, the Court's reasoning specifically invoked procedural default.

The Court's April 5, 1988 Order held that Scott had failed to comply with the Court's January 10, 1984 Order, which stayed these proceedings so that Scott could present "each and every and all claims not previously heretofore presented to the Florida state courts." Subsequent to that Order, the Supreme Court of the United States decided the case of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

*Caldwell* was issued over one year before the Circuit Court denied Scott's motion to vacate judgment and/or sentence. Additionally, the *Adams* decision, which applied *Caldwell* to Florida's advisory jury scheme, was decided before the Supreme Court of Florida entered its opinion affirming the circuit court order. The Court's April 5, 1988 Order concluded that Scott's unexplained failure to raise the *Caldwell* required the Court to enforce its previous warning that any claims not presented to the Florida courts during the stay "shall be deemed to have been waived." Similarly, this failure means that Scott has procedurally defaulted on the *Adams* claim under *Lindsey*, 820 F.2d 1137, and his motion to amend the petition be, and the same is, hereby DENIED.

## V. Conviction Claims

### a. Opening Statement

■ Scott contends that the trial court improperly prevented his trial counsel, Barrs, from making an opening statement. Scott exhausted this claim by fairly presenting it to the Supreme Court of Florida in his habeas petition, and the court rejected it on the merits. The record reveals, however, that the trial court did not prevent Barrs from making an opening statement. Rather, the court granted the state's motion to preclude Barrs from mak-

---

1. The Supreme Court of Florida could have invoked procedural bar instead of adjudicating the merits of Scott's ineffective assistance of *trial* counsel claim, which the court did unquestionably reach on the merits. Scott raised for the first time in 1986 a challenge to the effectiveness of his trial counsel. He had already filed a direct appeal *and* a habeas petition. On appeal in 1983, the Supreme Court of Florida noted that "Scott has not challenged the effectiveness of his trial counsel, but does, by [this] petition for habeas corpus, challenge the effectiveness of appellate counsel." Rule 3.850 precludes a motion to vacate or set aside a sentence brought two years after final judgment unless the defendant demonstrates cause for the delay. This highlights that a state court can overlook *its own procedural default rules*, and that when it does so a federal habeas court must also address the merits. *See Oliver.*

ing reference to the victim's alleged drug use and homosexuality. Given the court's ruling, Barrs declined to make an opening statement, and he instead accepted the court's offer to make a statement at the beginning of the defendant's case.

The trial court based this ruling on its conclusion that in all probability the only evidence of these matters would come out if Scott testified in his defense. While Barrs did state that he expected Scott to take the stand, the court decided to review this matter at the close of the state's case. In fact, Scott never took the stand. In addition, the court was unconvinced of the relevancy of the victim's alleged drug use and homosexuality. Barrs acknowledged that it was not his "intention that anyone has the right to commit a crime against a person because they're homosexual." Barrs' only proffer of relevancy was that "[s]uch activity was occurring at the time of the incident and no one could describe the incident without mentioning it."

■ As the record reveals that the trial court merely granted the state's motion in limine, as opposed to actually preventing defense counsel from making an opening statement, the gravity of Scott's claim of error is unmistakably lessened. A trial court clearly has the power and obligation to ensure that a party's opening statement addresses relevant matters which will come out through the evidence at trial. In any event, the Constitution does not give a criminal defendant the right to make an opening statement. *United States v. Zielie*, 734 F.2d 1447, 1455 (11th Cir.1984), *cert. denied*, 469 U.S. 1216, 105 S.Ct. 1192, 84 L.Ed.2d 338 (1985).

#### b. Premeditation

■ Scott argues that the evidence of premeditation was insufficient to sustain the jury's verdict. The jury was instructed on both felony murder and premeditation. Scott states that as the jury's general verdict does not allow a reviewing court to determine whether the jury relied upon felony murder exclusively, the verdict must be overturned. It is true that where a conviction on a general verdict could have been based on two separate grounds, and one of those grounds is constitutionally

impermissible, then reversal is mandatory. *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).

Scott preserved this claim by raising it on direct appeal, where the Florida Supreme Court found the evidence sufficient to establish premeditation. The court specifically concluded that "[t]he manner in which the victim was murdered in itself evidences premeditation." *Scott*, 411 So.2d at 868. The court based its conclusion on the circumstances of the murder. "There was a long bloody chase throughout the house, the victim was badly beaten, his hands and feet were tied while he was still alive, and he was struck on the head six times with a blunt instrument." *Id*. In addition, the court understood that the jury may have accepted the testimony of Charles Soutullo, who testified that Scott and Richard Kondian had expressed an intention to rob and murder Alessi.

■ When a federal habeas petition challenges the sufficiency of the evidence supporting his conviction, a court must conduct a "review of the record in the light most favorable to the prosecution [to determine whether] a rational factfinder could readily have found the petitioner guilty beyond a reasonable doubt...." *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See also Smith v. White*, 815 F.2d 1401 (11th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). As the Supreme Court of Florida correctly noted, the testimony of Soutullo provided direct evidence of Scott's premeditation, and in the light most favorable to the prosecution, the jury could have found Scott guilty of premeditated murder beyond a reasonable doubt. Following this Court's own independent review of the record, it also finds that the jury could have found that Scott committed premeditated murder.

#### c. Felony Murder

■ As with the sufficiency of the evidence supporting premeditation, Scott also challenges the sufficiency of the evidence

of supporting a felony murder conviction. As above, the *Jackson* case governs the appropriate standard of review. Scott argues that the murder took place at a different time and place than did the burglary, such that the murder was not committed by one "engaged in the perpetration" of the burglary. The Supreme Court of Florida rejected this contention on direct appeal. The court found that "there is sufficient evidence in the record to support the felony murder instructions given by the trial court," and that there was sufficient evidence of robbery and burglary.

A former business associate of Alessi, Nancy Flair, testified that on the Saturday preceding his murder, Alessi was wearing a gold teddy bear charm which he had recently purchased along with two others. Police officers discovered just such a gold bear charm in Scott's hotel room after his arrest in California. The thrust of Scott's present claim, however, is that the record principally addresses the burglary at Alessi's jewelry and flower shop, where 80 to 130 pieces of jewelry were found missing after Alessi's murder.

Scott contends that there is insufficient evidence linking the shop burglary to Alessi's murder at his home, and that consequently, Alessi's murder was not committed in the perpetration of the shop burglary. In short, Scott's position is that the evidence was insufficient to support a continuity of time and place between the perpetration of the shop burglary and Alessi's murder. But resolution of this contention is unnecessary to a ruling that the evidence was sufficient to establish that the murder took place during the perpetration of a burglary.

Initially, Flair's testimony reasonably supports the conclusion that Scott took jewelry from Alessi's person. But Scott's own habeas petition admits to the factual basis supporting a felony murder instruction. Scott made reference to his sworn testimony to the Florida Probation and Parole Commission upon his clemency application. Relying upon that testimony, Scott now admits that he "agreed to go along with Kondian with the understanding that a simple larceny had been planned. While Kondian engaged in sex with Alessi, [Scott]

searched for a money bag and jewelry." Given these admissions and Flair's testimony, this Court finds that the record supports the felony murder instruction and a jury verdict of felony murder.

#### d. Yom Kippur

Scott moved for a one day continuance of trial because Yom Kippur fell on the day jury selection was set to begin, October 1, 1979. The trial court denied the motion for continuance, and subsequently, a motion for a new trial due to the alleged error of not having granted the continuance. On direct appeal, the Supreme Court of Florida found that there was "no evidence in this case demonstrating deliberate or systematic exclusion of members of the Jewish faith and no evidence of underrepresentation on the jury panel in this case." *Scott,* 411 So.2d at 868.

 "[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). In order to establish such a Sixth Amendment violation, the defendant must show that the alleged excluded group is distinctive in the community, that the group's representation was not fair and reasonable, and that the resulting underrepresentation resulted from systematic exclusion. *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed. 2d 579 (1979).

 Scott focuses his attack at the trial court's statement that "if your client was of the Jewish faith, that's one thing—he wants to be tried by his peers; but here, he's not of the Jewish faith." The trial court did hold an evidentiary hearing on Scott's motion for continuance, where the jury clerk testified that she had granted all requests by Jewish people who called her office and requested to be re-scheduled due to Yom Kippur. She was unable, however, to state how many such requests her office had received and granted, although she herself granted about five requests. Finally, she had no knowledge of the religious composition of the jury pool for Scott's trial.

The record does not indicate whether any Jewish people were in fact in Scott's jury pool. Scott's failure to demonstrate that his jury pool was in fact defective in that it underrepresented Jewish people completely undermines his position under the *Duren* standard. Consequently, although the trial court misstated the law in saying that Scott's own religious or ethnic status was relevant to the composition of the jury panel, this error was harmless in light of Scott's failure to show that his panel actually lacked people of the Jewish faith. Finally, the court in *Grech v. Wainwright*, 492 F.2d 747 (5th Cir.1974), specifically upheld a trial judge's discretion to excuse Jewish veniremen from jury service on Yom Kippur against the defendant's Sixth Amendment challenge.

e. Kondian's Appearance

Scott claims prejudicial error in the trial court's decision to allow the state to bring Kondian before the jury. Kondian did not testify, and the state sought to present him before the jury solely in order to demonstrate that Scott was the larger of the two men. The state argued to the court mid-way through trial that "it's becoming increasingly clear from the evidence that an attempt is being set up [by the defense] to set up Mr. Kondian as having been responsible for all or most of the conduct."

Defense counsel objected that such a defense was apparent all along, and that the state's "surprise" presentation of Kondian was inappropriate given the state's failure to raise this possibility at the pre-trial conference. In addition, counsel objected that Kondian had already been in jail for 10 months and that his present appearance was not probative of his physical condition at the time of the murder. The court overruled these objections and allowed the State to have a witness identify Kondian.

In its order denying his petition for writ of habeas corpus, the Supreme Court of Florida rejected Scott's argument that this "surprise" presentation was unconstitutional. Scott does not contend that the court prevented him from cross-examining Kondian. Indeed, defense counsel never requested to cross-examine Kondian. The state presented the testimony of police officer Phil Sweeting, who was asked whether he knew Kondian and whether Kondian was present in the courtroom. Officer Sweeting responded affirmatively to both questions, and then made an in-court identification of Kondian.

The basis for Scott's constitutional challenge to this identification is unclear. Scott argues that this procedure was violative of Florida's own rules of criminal procedure, and that the state's failure "to follow clearly applicable state precedent and procedure affecting the fact-finding process is a federal constitutional violation of due process and the right to a fair trial." Scott cites two cases for this proposition, neither of which support it. *See Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and *Fast v. Wainwright*, 439 F.2d 1162 (5th Cir.1971).

A criminal defendant's right of Due Process requires a prosecutor to disclose *exculpatory* evidence favorable to the defense. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *U.S. v. Stewart*, 820 F.2d 370, 374 (11th Cir.), *reh'g denied*, 829 F.2d 1132 (1987). The state's exhibition of Kondian, of course, was designed to strengthen the state's case. Furthermore, the Sixth Amendment right of confrontation is not "a constitutionally-compelled rule of pretrial discovery." *Pennsylvania v. Ritchie*, 480 U.S. 39, ——, 107 S.Ct. 989, 999, 94 L.Ed. 2d 40 (1987). It "does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Id.* While a party's failure to identify a witness before trial may allow the judge to exclude that witness' testimony at trial as a sanction, such exclusion is hardly constitutionally mandatory. *See Taylor v. Illinois*, —— U.S. ——, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

f. Cross-examination of Sweeting

Scott claims that the trial court violated his Sixth Amendment right by sustaining the state's objection to defense counsel's attempt to cross-examine Sweeting on his identification of Kondian. The

Supreme Court of Florida rejected this claim in Scott's habeas petition. When Sweeting first identified Kondian, defense counsel declined the court's offer of cross-examination. "None, at this time, Judge." The court then accepted defense counsel's request that "the record reflect that Mr. Kondian was sitting on the bench inside the railing approximately eight feet from the jury box, accompanied by his attorney, David Roth?"

After a short recess, the state then proceeded to examine Sweeting on the crime scene. Sweeting was in charge of processing the crime scene and collecting the evidence. After direct examination, defense counsel cross-examined Sweeting concerning the crime scene and the evidence. On re-direct examination, the state then asked Sweeting about the presence of any drugs at the scene and a statue found at Alessi's feet. On re-cross, defense counsel asked Sweeting "[a]nd earlier today in your testimony, you identified a fellow named Rick Kondian?" The state objected on the basis that this question was beyond the scope of re-direct examination.

"[T]he right of confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination." *Ritchie*, 107 S.Ct. at 999. But the Supreme Court summarized that "[i]n short, the Confrontation Clause only guarantees 'an *opportunity* for effective cross-examination....'" *Id.* The trial court, of course, did afford defense counsel an opportunity to cross-examine Sweeting regarding his identification of Kondian. Barrs declined this opportunity. He instead sought to inquire into Sweeting's identification on re-cross-examination during Sweeting's testimony concerning the crime scene.

The *Ritchie* Court stated that "we hardly need say that nothing in our opinion today is intended to alter a trial judge's traditional power to control the *scope* of cross-examination by prohibiting question that are prejudicial, irrelevant, *or otherwise improper.*" *Id.* at 999 n. 9 (emphasis added). Given defense counsel's decision not to cross-examine Sweeting when asked to do so, and a trial court's traditional discretion

to control the scope of examination, the trial court committed no error in sustaining the state's objection. *See, e.g.,* Fed.R.Evid. 611.

### g. Scott as an Inmate

■ The trial court denied Scott's motion for a mistrial following testimony that he was an inmate in the Palm Beach County Jail. The Supreme Court of Florida rejected this argument in its opinion denying Scott's petition for a writ of habeas corpus. Scott claims that this testimony deprived him of the presumption of innocence. Nurse Verna Reddick testified that she had taken a blood sample from Scott while he was an inmate in the County jail. Her testimony established the chain of custody of a blood sample analyzed by the crime lab. It did not deprive Scott of the presumption of innocence, and the jury was properly instructed on the state's burden at the close of trial.

### h. Multi-underlying-felony theory

■ Scott raises two related objections to the state's use of what he terms a "multi-underlying-felony" theory. First, he claims that the state improperly failed to specify in the Bill of Particulars dated February 8, 1979 or at the charge conference the particular felony which formed the basis of the felony murder instruction. Second, he claims that the state improperly argued that any number of underlying felonies could form the basis of a felony murder conviction, including Alessi's florist and jewelry shop's burglary.

The Supreme Court of Florida on direct appeal rejected Scott's challenge that the trial court committed error by instructing the jury on felony murder. Scott raised this "multi-underlying-felony" theory argument in his state habeas petition. Scott challenged this as "fundamental error," but the court rejected all such claims as having "no merit."

Scott's first challenge is that by failing to specify in the charging document or the Bill of Particulars which felony constituted the basis for felony murder, he failed to receive constitutionally required notice of the crimes with which he was charged.

"No principal of procedural due process is more clearly established than that notice of the specific charge ... [is] among the constitutional rights of every accused in a criminal proceeding, state or federal." *Cole v. Arkansas*, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed.2d 644 (1948).

The state responds that pursuant to *Knight v. State*, 338 So.2d 201 (Fla.1976), under Florida law an information charging premeditated murder sufficiently encompasses felony murder to allow a felony murder theory of prosecution. Given this imputed knowledge under state law, this court held in *Knight v. Wainwright*, Case No. 81–391–WMH (S.D.Fla. June 27, 1986) (Hoeveler, J.), that a defendant charged in Florida with premeditated murder is given constitutionally adequate notice of a felony murder theory.

The defendant in *Knight* also contended that the trial court erred by not instructing the jury on the elements of the crimes constituting the underlying felonies. This court held, however, that "the trial court's omission as to the elements of the underlying felonies was harmless beyond a reasonable doubt." In this case, though, the trial court *did* instruct the jury as to the specific elements required under Florida law for both burglary and robbery. Given these full and complete instructions on the elements of the underlying felonies, no error occurred.

### i. Death Qualified Jury

Scott contends that his Sixth and Fourteenth Amendment rights were violated under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), when the trial court excused certain jurors. The Supreme Court of Florida on direct appeal held that the trial court did not err by "excusing, for cause, jurors who unequivocally stated that they would not recommend the death penalty under any circumstances." *Scott*, 411 So.2d at 869.

In *Witherspoon*, the Supreme Court held that the death sentence of a defendant cannot stand where the court purged the jury pursuant to a state statute of all persons who admitted to "conscientious scruples" against the death penalty or who were "opposed" to the death penalty. Pursuant to this statute, the trial court had removed 47 veniremen as being either opposed or having scruples against the death penalty. But importantly, the *Witherspoon* Court left open the question of whether the court could have removed only those jurors who "would refuse even to consider" the death penalty in the case before them. *Id.* 391 U.S. at 514, 88 S.Ct. at 1772.

The Supreme Court has subsequently definitively upheld the ability of a court to exclude jurors who indicate that they would refuse to consider or impose the death penalty under any circumstances. In *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Court upheld the conviction of a defendant convicted of felony murder and sentenced to life, although the prosecution had sought the death penalty. The Court concluded that the trial court had properly removed all jurors who indicated that their opposition to the death penalty was so strong that it would substantially impair their duties as jurors.

The Supreme Court recently extended the *Lockhart* holding to uphold the conviction of a defendant by a death-qualified jury, where the prosecution sought the death sentence only against the defendant's co-defendant. *Buchanan v. Kentucky*, —— U.S. ——, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). Given these holdings, it is clear that the state is only precluded from removing the broad spectrum of people who merely "oppose" or have "scruples" against the death penalty.

Neither the state nor the trial court violated *Witherspoon*. The prosecutor asked the jury whether "any of you hold such beliefs regarding capital punishment that you could conceive of no circumstances under which you would vote to have it imposed?" The trial court also inquired of jurors whether it was their "position that no matter what evidence the State would present to you for your consideration concerning the death penalty, under no circumstances could you impose a death penalty." The only jurors the court excused were those who indicated that they

could impose the death penalty under "no circumstances." The *Lockhart* case clearly validates the trial court's excusing of these jurors.

### j. Lesser included offenses

At paragraph 20 of his original complaint, Scott claims that his conviction is unconstitutional because Florida law required the court to instruct the jury as to all lesser included offense, regardless of the factual predicate supporting them. Scott argued in his state habeas petition that this was fundamental error, but the court rejected this challenge as meritless.

The Supreme Court of Florida subsequently abolished this practice by adopting Fla.R.Crim.P. 3.510, which provides that "[t]he judge shall not instruct on any lesser included offenses as to which there is no evidence." Scott did not allege this claim in his amended petition, but the state did respond to it in the state's original opposition and the Court views it as being properly preserved and presented.

Scott contends that instructing as to all lesser included offenses inevitably leads to arbitrary results. The Supreme Court has specifically upheld the jury's consideration of lesser included offenses in a Florida death case against the defendant's challenge that it inevitably led to arbitrary results. *Proffitt v. Florida*, 428 U.S. 242, 254, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976). Furthermore, in *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Court held that a defendant was constitutionally *entitled* to the lesser included offense instruction of felony murder. *See also Rembert v. Dugger*, 842 F.2d 301 (11th Cir.1988).

The failure of the trial court in *Beck* to give the lesser included offense instruction forced the jury to choose between acquittal and the death penalty. In short, the trial court prevented the jury from considering the "third option" of a conviction of felony murder. Florida's previous practice merely insured that a jury always had this third option of the lesser included offenses. "[A] decision to afford a defendant mercy violates no constitutional precepts." *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir.1978).

### k. Ineffective Assistance of Appellate Counsel

Scott asserts that his appellate counsel was ineffective with regard to any issues "not raised on direct appeal but which were presented to the Supreme Court of Florida in habeas or coram nobis proceedings...." In its opinion denying habeas relief, the Supreme Court of Florida held that Scott's appellate counsel was not constitutionally ineffective. Appellate "[c]ounsel is, of course, permitted to winnow out weaker arguments from his appellate brief." *Julius v. Johnson*, 840 F.2d 1533, 1543–44 (11th Cir.1988).

The standard for judging effective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This is a two-part test, where the defendant must first show that defense counsel's performance was so deficient that he was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* at 668, 104 S.Ct. at 2052.

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

*Id.* at 690, 104 S.Ct. at 2066.

The second part of the *Strickland* test is the "prejudice" prong. A defendant must show that any ineffectiveness results in a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Importantly, both parts of the test must be satisfied, and a defendant's claim must be rejected "if the defendant makes an insufficient showing on one." *Id.* at 697, 104 S.Ct. at 2069–2070. The prejudice requirement is especially significant in this case. Scott's present claim alleges ineffectiveness in appellate counsel. Certainly where a petitioner is procedurally barred from pressing a claim in collateral proceedings because ap-

pellate counsel was ineffective, appellate counsel's ineffectiveness has prejudiced him.

In order to demonstrate prejudice Scott must show that any ineffectiveness resulted in a state court subsequent to his appeal not considering the merits of a claim because it was not raised on direct appeal.[2] But if a state court subsequently reviewed on their merits claims ineffectively not contained in Scott's direct appeal, he can demonstrate no prejudice because the object of his appeal is to obtain a de novo judgment on the trial court's legal rulings.

In this case, of course, the Supreme Court of Florida in its habeas opinion specifically held that appellate counsel was not ineffective because the court *would* have rejected those claims Scott identified appellate counsel as having been ineffective for not raising same on appeal. This Court has itself independently reviewed and rejected each of these claims on their merits. This rejection of the merits of these claims can be described under either the competency or the prejudice prongs of *Strickland.*

The unmistakable import of the Supreme Court of Florida's analysis was that appellate counsel did not act outside the wide range of professional competence by failing to raise a number of "frivolous" claims on appeal. While the Court does not label each of Scott's claims necessarily frivolous, it agrees that appellate counsel was not ineffective by not pressing meritless claims. Alternatively, the rejection of these claims on their merits can be described under the prejudice prong as meaning that no harm came to Scott even assuming appellate counsel was incompetent by not raising these issue on appeal, because they would have been unsuccessful. Under either description, however, appel-

late counsel was not ineffective under *Strickland* by not raising these claims on their merits.

Scott's federal habeas petition only alleges ineffectiveness for those claims not raised on appeal which were "presented to the Supreme Court of Florida in habeas corpus or coram nobis proceedings...." Consequently, as these claims are meritless, appellate counsel was not ineffective. A District Court evaluating an ineffective assistance of appellate counsel claim, however, cannot narrowly focus on only those particular instances of ineffectiveness presented by a petitioner. *Matire v. Wainwright,* 811 F.2d 1430 (11th Cir.1987). Rather, the Court has a "duty to evaluate any deficiencies in light of the record as a whole to determine whether it was reasonably probable that the outcome would have been different." *Id.* at 1434.

The teaching of *Matire* is that the Court must review the entire record to identify any other specific claims which appellate counsel ineffectively failed to raise on appeal and which thereby prejudiced Scott. Considering the entire record, the one claim which most glaringly was not raised on direct appeal was ineffective assistance of trial counsel. The Supreme Court of Florida specifically noted that Scott's appellate counsel did not raise an ineffective assistance of trial counsel claim on direct appeal. Indeed, Scott also failed to raise this claim in his state habeas petition. He does, however, raise the trial counsel issue in this petition.

Yet Scott is not prejudiced by appellate counsel's failure to raise this claim, because the Supreme Court of Florida rejected it on the merits in his subsequent Rule 3.850 proceeding. *See Scott,* 513 So.2d 653. Scott has suffered no procedural bar to the

---

**2.** As ineffective assistance of counsel is a justifiable "cause" for procedural default in the state courts, a federal habeas court should not refuse to address the merits of a claim ineffectively not raised on direct appeal. *Murray,* 106 S.Ct. at 2646. This raises the possibility that, for purposes of a federal habeas petition, a defendant can never be "prejudiced" due to state appellate counsel's ineffectiveness because the claimed prejudice is cured by the federal court's consideration of the defendant's claims on their mer-

its. But in order to ignore the procedural default, the federal court must first find appellate counsel's performance ineffective, which in itself requires a demonstration of prejudice, presumably the state procedural default. Consequently, the more logical distinction is that where the state courts have themselves considered the merits in subsequent collateral proceedings, a defendant is not prejudiced by claims not raised on direct appeal.

Court's consideration of his trial counsel claim, and therefore he is not prejudiced simply because appellate counsel failed to raise it on direct appeal.

## VI. Sentencing Claims

### a. Nonstatutory aggravating circumstances

In its habeas opinion, the Supreme Court of Florida rejected Scott's argument that the trial court improperly found nonstatutory aggravating circumstances in its sentencing order. The trial court stated: "The defendant's offenses as a juvenile, relating to auto theft and stealing Christmas tree lights, are not, by themselves, considered significant, nor can they be totally ignored." Statutory aggravating and mitigating factors provide an important mechanism to narrow the jury's discretion and to give trial judges "specific and detailed guidance to assist them in deciding whether to impose a death penalty or imprisonment for life." *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

■ A death sentencing scheme must provide "carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence...." *McClesky v. Kemp*, —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Furthermore, where an aggravating factor is vague and fails to limit the sentencer's arbitrary power to impose the death penalty, a sentencer's reliance upon it is improper under the Eighth Amendment. *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

■ Yet the Constitution permits a trial court to weigh a defendant's "juvenile convictions, non-convictions, and other nonstatutory aggravating factors" in considering the death penalty. *Lindsey*, 820 F.2d at 1154. While "statutory aggravating circumstances play a constitutionally necessary function ... [by] circumscrib[ing] the class of persons eligible for the death penalty.... the Constitution does not require

the jury to ignore other possible aggravating factors in the process of selecting, *from among that class*, those defendants who will actually be sentenced to death." *Zant v. Stephens*, 462 U.S. 862, 876, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983) (emphasis added).

The critical point of *Zant* is that once constitutionally proper statutory aggravating factors have achieved the "narrowing function," the sentencer may consider other relevant factors bearing on the appropriateness of the death penalty. In *Zant*, the Court upheld the death sentence although the jury had considered nonstatutory aggravating evidence of the defendant's prior convictions. The Court found that "the narrowing function has been properly achieved ... by the two valid aggravating circumstances...." *Id.* at 879, 103 S.Ct. at 2744.

■ The trial court's sentencing order conclusively establishes that constitutionally permissible statutory aggravating factors formed the basis of the death sentence. The court found that Scott committed the murder while he was under a sentence of imprisonment, that Scott had previously been convicted of a felony involving the use or threat of violence to the person, that Scott was engaged or an accomplice in the commission or attempted commission of a robbery and/or burglary, that Scott committed the murder for pecuniary gain, and that the murder was cruel.

These statutory aggravating factors, as in *Zant*, place Scott among that class who constitutionally may be sentenced to death. Furthermore, the court's order itself makes it clear that the sentence was not predicated upon Scott's juvenile crimes. "The [statutory] aggravating circumstances found to exist ... far outweigh any mitigating circumstances presented during the sentencing proceedings...." In short, the trial court did not in fact weigh these prior incidents as aggravating factors although the Constitution would not have prevented it from doing so.[3]

---

3. *Zant* explicitly recognized that "[a] state is, of course, free to decide as a matter of state law to limit the evidence of aggravating factors that the prosecution may offer at the sentencing hearing." 462 U.S. at 879 n. 17, 103 S.Ct. at 2743 n.

17. Both the *Zant* Court and the *Lindsey* court considered Georgia's death sentencing scheme, which as a matter of state law permits consideration of all facts and circumstances in aggravation of punishment. Those decisions establish,

### b. First degree murder

Scott argues that the prosecutor improperly argued to the jury that Scott previously had been charged with first degree murder in California, although Scott had pled guilty to the lesser offense of second degree murder. Scott states that his alleged charge with first degree murder was outside the scope of the evidence and that it constituted an improper nonstatutory aggravating circumstance. Scott raised this argument as evidencing appellate counsel's ineffectiveness in his state habeas petition.

At the sentencing phase, the prosecutor proceeded to itemize each statutory aggravating factor. In describing the second aggravating factor, the state argued that Scott "has a prior conviction for a crime of violence or another capital crime." The prosecutor described Scott's participation in a 1974 liquor store robbery in California where Scott's accomplice shot and killed the clerk. "It was another felony murder, first degree murder, in which he plead guilty to the lesser offense of second degree murder and was sentenced to prison."

Scott's conviction for the 1974 murder was, of course, properly presented to the jury as a statutory aggravating factor, and Scott does not contend otherwise. Rather, he challenges the prosecutor's mere mention of the fact—undisputed now by Scott—that he was charged with felony first degree murder. The Court finds no constitutional error in this statement of fact concerning a valid statutory aggravating factor.

### c. Brad Fisher's cross-examination

Scott charges that the trial court erred by allowing the state to cross-examine defense witness Dr. Brad Fisher although Scott had waived any reliance upon a theory of no significant criminal history. The Supreme Court of Florida rejected this argument in its habeas opinion. The trial court accepted Fisher as an expert clinical psychologist.

Fisher testified that he reviewed every piece of information he could obtain in order to evaluate Scott. This included Scott's previous psychological reports, reports from social workers and probation officers, his prison records from California, and interviews with Scott and his attorneys. Fisher found that Scott's early development had "an absolute lack of structure" and that his family life was in "total chaos." He concluded that prison provided much needed structure for Scott, and that he had in fact done very well during his previous stays in confinement.

Prior to Fisher's testimony, Scott had filed a written motion seeking to preclude the state from presenting evidence of prior misconduct which did not result in a conviction. In this motion, Scott expressly waived any reliance upon the statutory mitigating factor of "no significant history of prior criminal activity." Fla.Stat. sec. 921.-141(6)(a) (1977). The trial court initially reserved ruling on Scott's motion in limine, finding that Scott's prior conduct could be relevant to rebut defense testimony, depending upon the mitigating evidence offered in defense. Subsequently, the court rejected Scott's objections to the state's cross-examination of Fisher.

There is no question concerning the propriety of Scott's presentation of Fisher's testimony. A defendant is given wide latitude in presenting nonstatutory mitigating evidence. *See Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). The question presented is whether the trial court improperly allowed the state to cross-examine Fisher concerning Scott's juvenile acts of stealing Christmas tree lights and an automobile, his strong-armed robbery of a dollar from his neighbor, his drug use and heroin addiction, and his escape from prison and involvement in a robbery.

Scott's reliance upon his waiver of the no significant criminal history defense is misplaced. It overlooks that Scott *was* presenting mitigating evidence in the form

---

however, that such consideration of nonstatutory aggravating circumstances is constitutionally permissible. Consequently, while Florida's death sentencing statute does not itself autho-

rize a trial court to consider nonstatutory aggravating factors, the trial court's error, if any, was a matter of state law only.

of a plea for mercy through Fisher's testimony. Scott never waived reliance upon this permissible nonstatutory mitigating factor. Consequently, his waiver is irrelevant to the issue of Fisher's cross-examination. Furthermore, *Zant's* lesson is that the sentencer may properly consider nonstatutory aggravating factors where the defendant is found to have constitutionally permissible statutory aggravating factors.

Through Fisher's cross-examination, the state sought to test the basis and assumptions of Fisher's description of Scott's character. This involved questioning Fisher as to how particular prior acts committed by Scott comported with Fisher's analysis and conclusions. The state did not present its own witness to testify concerning these prior acts. As Scott was already properly classified as subject to the death penalty due to proper statutory aggravating factors, the state's cross-examination of Fisher was entirely proper. *See Zant,* 462 U.S. 862, 103 S.Ct. 2733.

### d. Burden of Proof

Scott challenges Fla.Stat. 921.-141(3)(b), which required the trial court to find that there were insufficient mitigating factors to outweigh the aggravating factors. He claims that this instruction improperly places the burden of proof on the defendant. Scott argued in his state habeas petition that this constituted fundamental error. The Eleventh Circuit, however, has definitively rejected this argument. *See Ford v. Strickland,* 696 F.2d 804, 817–18 (5th Cir.) (en banc), *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed. 2d 176 (1983).

### e. Scott's age

Scott claims that the trial court improperly failed to weigh as a mitigating factor Scott's age at the time of the crime. Scott made this argument in his state habeas petition, claiming it constituted fundamental error. The Supreme Court of Florida, however, found "no merit" to this claim. This claim is not procedurally barred. *Smith v. Dugger,* 840 F.2d 787 (11th Cir.1988). The trial court did not restrict defense counsel from arguing to the jury that Scott's age was a mitigating factor. In fact, the age of the defendant at the time of the crime was a statutory mitigating factor. The trial court also took account of a variety of nonstatutory mitigating factors.

"*Lockett* stands for the proposition that the sentencer must *consider* all mitigating evidence. After so doing, it then is generally free to accord that evidence such weight in mitigation that it deems fit." *Raulerson v. Wainwright,* 732 F.2d 803, 808 (11th Cir.), *cert. denied,* 469 U.S. 966, 105 S.Ct. 366, 86 L.Ed.2d 302 (1984). The law does "not require that the sentencing body *accept* the conclusion that the evidence constitutes a mitigating circumstance or that the mitigating circumstances outweigh the aggravating circumstances." *Harich v. Wainwright,* 813 F.2d 1082, 1101 (11th Cir.1987), *aff'd on this issue,* 844 F.2d 1464 (11th Cir.1988) (en banc). Thus, where the court hears all relevant mitigating evidence, but concludes simply that "there are no such non-statutory mitigating circumstances," then it has fulfilled its constitutional mandate. *Id.* at 807. The trial court therefore had no duty to actually regard Scott's age as a mitigating factor.

### f. Donald Reid, Jr.

Scott argues that the trial court improperly prevented him from presenting the testimony of journalist Donald Reid, Jr. during the sentencing phase of trial. The Supreme Court of Florida rejected this contention on direct appeal. After receiving a proffer of Reid's testimony, the trial court ruled it irrelevant and sustained the state's objection.

"[T]he sentencer ... [cannot] be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *McClesky v. Kemp,* —— U.S. ——, ——, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262 (1987) (quoting *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). Indeed the trial court expressly recognized this in its sentencing order: "The Court did not limit the evidence to the mitigating circumstances set forth in the Florida statute but followed the law as set forth by the United

States Supreme Court in its decision of *Lockett v. Ohio*" (citation omitted).

While there was some confusion in Florida from 1972 to 1978 on whether nonstatutory mitigating evidence was permissible, there was clearly no such confusion in Scott's 1979 trial. *See Elledge v. Dugger,* 823 F.2d 1439, 1448 (11th Cir.1987). This is certainly not a case where the trial court instructed the jury not to consider nonstatutory mitigating evidence and prevented the defendant from taking the stand at sentencing in order to describe how he felt about what he had done. *Magill v. Dugger,* 824 F.2d 879 (11th Cir.1987).

■ The trial court excluded Reid's testimony on the basis that it was irrelevant, and that "the witness's knowledge is more appropriate to address to the Legislature of the State of Florida in passing criminal laws and penalties." The *Lockett* Court expressly recognized "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." 438 U.S. at 604 n. 12, 98 S.Ct. at 2965 n. 12.

Reid testified that he had read a considerable amount of literature on the death penalty and that he had authored a book, *Eye Witness,* which recounted some of his experiences covering 189 executions as a reporter for the Associated Press. Reid testified that he is "definitely" an opponent of the death penalty, that "[t]wo wrongs don't make a right," and that "capital punishment as we know it today is not a deterrent to crime." Reid further recounted anecdotal experiences concerning the death penalty, and he compared the economic aspects of prison and the death penalty. Finally, Reid stated that he had met Scott and his family the night before and that he came "to the conclusion that prison would be a very good place for him."

In *Skipper v. South Carolina,* 476 U.S. 1, 7 n. 2, 106 S.Ct. 1669, 1672 n. 2, 90 L.Ed.2d 1 (1986), the Court held that "evidence of adjustability to life in prison unquestionably goes to a feature of the defendant's character that is highly relevant to a jury's sentencing determination." The Court reversed the defendant's death sentence because the trial court had excluded the testimony of two of the defendant's jailers and a frequent visitor familiar with his good behavior during his seven months in prison preceding trial. The Court found this testimony to "be 'mitigating' in the sense that [it] might serve 'as a basis for a sentence less than death.'" *Id.* at 1671.

In this case, Reid's proffered testimony can almost exclusively be described as attacking the death penalty's deterrent effect through the use of anecdotal stories. But "[e]vidence concerning whether the death penalty has a deterrent effect ... is *not* designed to help the sentencer focus on the unique characteristics of a particular capital defendant or crime. Rather, such evidence is designed to persuade the sentencer that the legislature erred ... when it enacted a death penalty statute." *Martin v. Wainwright,* 770 F.2d 918, 936 (11th Cir.1985), *modified on reh'g,* 781 F.2d 185, *cert. denied,* — U.S. —, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986). *See also Shriner v. Wainwright,* 715 F.2d 1452 (11th Cir.1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1328, 79 L.Ed.2d 723 (1984).

■ The final question presented in connection with this claim is whether the trial court erred by preventing Reid from testifying that he believed Scott would adjust well to prison life. The Supreme Court in *Skipper* recognized that a defendant's adjustment to prison life was highly relevant to his character. After the trial court sustained the state's objection to Reid's testimony, defense counsel specifically raised this aspect of Reid's testimony. "I presume, Judge, on your ruling, it's also the latter part of his testimony where he spoke of his personal contact with the Defendant?"

In *Skipper,* the Court rejected the state's argument that the trial court had only ruled that the defendant could not "offer incompetent lay opinion testimony regarding petitioner's ability to adjust to prison life in the future." 106 S.Ct. at 1671. The Court found that the record did not "support the State's contention that the trial court's ruling was no more than an even-handed application of rules restricting the

use of opinion testimony." Instead, the Court concluded that the defendant "was not offering opinion testimony regarding future events." Rather, the proposed testimony was that the defendant *"has made a good adjustment." Id.* at 1672.

One obvious distinction between the present facts and those in *Skipper* is that Reid was seeking to testify concerning Scott's *future* adjustment to prison. He stated that "prison *would* be a good place for him." This temporal distinction is significant, because the record fails to demonstrate any expertise on Reid's part to voice an opinion about an individual's future ability to adjust to prison. Furthermore, unlike the jail guards and the frequent visitor in *Skipper*, Reid had only met with Scott and his family on the night before his testimony. Consequently, Scott failed to establish even that Reid was a competent lay witness familiar with his previous adaptation to prison life.

g. Other nonstatutory mitigating factors

■ Scott claims that the trial court erred by failing to consider and weigh certain other nonstatutory mitigating evidence. In particular, Scott now lauds his decision not to bring in a weapon into the Preston Industrial School, a reformatory, as an act which "could have prevented a murder or other violent incident at the School." He also faults the court for not considering aspects of his sister's and mother's testimony concerning his assistance in raising his siblings, his veracity, and his hard work to help his family.

Scott made this argument in his state habeas petition. The Supreme Court of Florida rejected his claim that it constituted fundamental error. It is clear that while a Florida trial court has an obligation to hear all potentially relevant mitigating evidence, it does not actually have to regard the proffered evidence as mitigating against the death sentence. *Harich,* 813 F.2d at 1101, *aff'd on this issue,* 844 F.2d 1464 (11th Cir.1988); *Raulerson,* 732 F.2d at 808. The trial court therefore committed no error by not identifying Scott's sister's and mother's testimony as providing mitigating evidence.

h. Reasonable doubt

■ Essentially repeating the argument rejected in (e) above, Scott argues that the Florida death statute improperly fails to require the state to prove that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. Also as in (e), this claim meritless. *See Ford v. Strickland,* 696 F.2d 804, 817–18 (11th Cir.) (en banc), *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983).

i. Majority for life

■ Scott argues that the instruction given to the jury that a majority of jurors must recommend life imprisonment in order for a verdict of life imprisonment violates the Eighth Amendment. Scott described this as constituting fundamental error in his state habeas petition, but the court found it to have no merit. The trial court instructed the jury that its recommendation need not be unanimous, and that a majority was needed to recommend *either* life or death.

The trial court's instruction was erroneous under Florida law, as a tie vote of six to six is also a recommendation of life imprisonment. *Rose v. State,* 425 So.2d 521, 525 (Fla.1982). Nonetheless, this error has been held to be harmless where the vote recommending the death sentence was nine-three. *Harich v. Wainwright,* 813 F.2d 1082, 1104 (11th Cir.1987), *aff'd on this issue,* 844 F.2d 1464 (11th Cir.1988) (en banc). The record in this case does not reveal the jury's numerical division, but it does clearly demonstrate that Scott was not sentenced to die upon a tied jury verdict. Thus, as in *Harich,* any error was harmless.

j. Lesser included offenses

Scott raises in this sentencing claim the same claim he raised above in his conviction claims at (j); namely, that the trial court improperly instructed on lesser included offenses. For the reasons stated at (j) above, the Court also rejects this claim as sentencing error.

#### k. Supreme Court of Florida as sentencer

█ Scott claims that the Supreme Court of Florida has improperly sustained death sentences which are supported in part by erroneous aggravating factors, and that as a consequence the "court is assuming the role of the sentencer." Scott made this argument in his state habeas petition, but the Supreme Court of Florida found that it did not constitute fundamental error. But as no improper aggravating factors were considered in Scott's sentencing, Scott's hypothetical challenge to alleged improper practices by the Supreme Court of Florida is frivolous.

#### l. Heinous, atrocious or cruel

█ Scott claims that Florida cases have failed to establish a "consistent framework for the application" of this statutory aggravating factor. He specifically cites the case of *Halliwell v. State,* 323 So.2d 557 (Fla.1975), where the court overturned a death sentence because the defendant's bludgeoning of the victim was not "more shocking ... than in a majority of murder cases reviewed by this Court." Scott did argue on direct appeal that "it was improper to find that the murder was especially heinous, atrocious or cruel." In any event, the Eleventh Circuit recently has definitively rejected Scott's argument that Florida has failed to apply consistently this aggravating factor. *Harich v. Dugger,* 844 F.2d 1464 (11th Cir.1988) (en banc), *adopting panel opinion on this point,* 813 F.2d 1082, 1104 (11th Cir.1987).

#### m. Proportionality review

█ Scott contends that the Supreme Court of Florida unconstitutionally failed to afford him proportionality review by refusing to consider the plea colloquy and sentencing of co-perpetrator Kondian. Subsequent to Scott's trial, Kondian pled guilty and was sentenced to life in prison.

Scott, however, does not describe how the court allegedly "denied appellate counsel's request." Scott did argue on direct appeal that "the factors of the instant case do not justify the imposition of the Death Penalty." But he did not proffer Kondian's plea colloquy.

The Supreme Court has approved the Supreme Court of Florida's method of reviewing "each death sentence to ensure that similar results are reached in similar cases." *Proffitt,* 428 U.S. at 258, 96 S.Ct. at 2969. Even so, "where the statutory procedures adequately channel the sentencer's discretion, such proportionality review is not constitutionally required." [4] *McClesky,* 107 S.Ct. at 1774. Given Scott's failure to describe how the Supreme Court of Florida rejected his proffer of Kondian's plea, and his failure to make this argument on direct appeal, the Court finds his claim to be meritless.

#### n. Coram Nobis standard

Scott claims that Florida has established an unconstitutional standard for determining whether to consider factual evidence not introduced at trial. Subsequent to his direct appeal, Scott filed a petition to file a writ of error coram nobis in order to be able to proffer evidence which minimized his participation in Alessi's murder. The Supreme Court of Florida rejected this request and affirmed Scott's conviction and sentence. *Scott,* 433 So.2d at 975–76.

█ Florida's petition for writ of error coram nobis is described in *Hallman v. State,* 371 So.2d 482 (Fla.1979). The petition must describe with specificity the facts and the manner in which they are to be proved. The function of the writ is to correct errors of fact. *"The facts upon which the petition is based must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his*

---

4. This is not to say that the Eighth Amendment does not stand as an independent bulwark "against all punishments which by their excessive length or severity are greatly disproportionate to the offenses charged." *Weems v. United States,* 217 U.S. 349, 371 (1910). *See, e.g., Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (prohibiting execution of insane); *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (prohibiting execution of minor participants in a felony murder); *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (prohibiting execution of rapists).

counsel could not have known them by the use of diligence." *Id.* at 484–85.

The Supreme Court of Florida denied Scott's request for the writ on the basis that he "failed to demonstrate that the facts he now relies upon were not known to him at the time of trial or were not discoverable through the use of due diligence." *Scott,* 433 So.2d at 976. In effect, the *Hallman* standard establishes a procedural bar to consideration of factual evidence which a defendant reasonably could have introduced at trial. By his challenge, Scott assails the propriety of this procedural bar, and necessarily, the appropriateness of the Court's deference to it.

In *Presnell v. Kemp,* 835 F.2d 1567 (11th Cir.1988), the court held that a federal habeas court must honor what it described as the most common "three different [state] procedural default rules" unless the petitioner demonstrates cause and prejudice. The *Presnell* court acknowledged that "[m]ost states have other procedural default rules of general application," but determined that "[t]hese rules are not pertinent to our discussion here...." *Id.* at 1573 n. 17.

The *Hallman* standard precludes a defendant from presenting facts not contained in the record unless he demonstrates that they were unknown at trial and could not reasonably have been discovered before trial. This rule is somewhat analogous to the contemporaneous objection rule. Requiring a contemporaneous objection "may enable the trial court to prevent reversible error from occurring and to eliminate the grounds for an appeal." In addition, "if the trial court cannot prevent reversible error and declares a mistrial, it can convene a retrial promptly, accelerating the finality of the defendant's prosecution." *Presnell,* at 1574.

The *Presnell* court identified "secondary objectives" of the contemporaneous objection rule. Seasonable objections increase "the potential for an error-free trial and thus a verdict that reflects the truth." It also "may save the defendant from the stigma resulting from an unjust conviction." Further, "it improves the potential for a just verdict on retrial, because the

court, not having to await the outcome of an appeal or collateral attack proceeding, can commence the trial quickly, while the evidence is still fresh." Finally, the rule conserves judicial resources. *Id.* at 1574.

The question presented herein is whether Florida's *Hallman* standard is sufficiently similar to the contemporaneous objection rule that it is constitutional and therefore must be deferred to under the cause and prejudice standard. The constitutionality of state procedural default rules, such as contemporaneous objection, is amply demonstrated by a federal court's deference to them in a habeas proceeding, absent a demonstration of cause and prejudice. *See Sykes,* 433 U.S. 72, 97 S.Ct. 2497.

The similarity between the goals of the contemporaneous objection rule and the *Hallman* standard for coram nobis relief are striking. Both serve to further a trial verdict reflecting the "truth" and to avoid the defendant's stigmatization by an unjust conviction. They also serve to allow a retrial (or trial) nearer to the time of the underlying events, instead of after sometimes lengthy appeals. Consequently, *Hallman* is a perfectly appropriate procedural device to insure the centrality of the trial.

The cause and prejudice standard applies to all claims except those "involving fundamental decisions that should not, or realistically cannot, be delegated to counsel, such as the defendant's decision to plead guilty, waive his right to a jury trial, or take an appeal." *Presnell,* 835 F.2d at 1577. Scott's failure to muster all of the allegedly exculpatory evidence reasonably available to him at trial is not such a fundamental decision, and is thus analyzed under the cause and prejudice standard.

Scott contends that *Hallman* is unconstitutional. But *Hallman* excludes factual evidence only if the defendant fails to show cause for his failure to have adduced it at trial. This parallels the cause prong of *Sykes,* which requires a demonstration "that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct.

2639, 2646, 91 L.Ed.2d 397. Furthermore, under the abuse of writ doctrine, federal courts refuse to consider new evidence which "was available at the time of the first petition" because a petitioner "should have presented it then." *Fleming v. Kemp,* 837 F.2d 940 (11th Cir.1988).

 While *Hallman* is designed only to correct errors of fact, Scott describes the cause for his failure to adduce this factual evidence at trial as being the "intervening and controlling case of *Enmund v. Florida.*" *See* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Where the legal basis for a claim was not reasonably available to counsel at trial or on appeal, a defendant is generally able to demonstrate cause for a procedural default. *Murray,* 106 S.Ct. at 2646. A novel and unpredictable change in the law provides a sufficient cause for procedural default. *See Adams v. Dugger,* 804 F.2d 1526, (11th Cir.1986), *amended on reh'g,* 816 F.2d 1493 (11th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1106, 99 L.Ed.2d 267 (1988). Thus, if the *Enmund* decision was such a change in the law—by making evidence relevant which was irrelevant previously—then Scott has an arguable claim that this exculpatory evidence was improperly not considered by the Supreme Court of Florida.

 Scott contends that the Supreme Court of Florida should have considered statements by three individuals to whom Kondian admitted killing Alessi and exonerating Scott, at least as not being the actual murderer. He acknowledges that the court considered his testimony before the Parole Commission, where he testified to a version of the murder consistent with these three statements allegedly containing Kondian's admissions.

Scott does not deny that these facts— certainly those contained in his own clemency testimony—were available to him at the time of trial. Rather, he contends that until *Enmund* he had at least a substantially lessened reason to offer this evidence in mitigation, because "[w]ithout *Enmund,* the new testimony would not have barred the imposition of the death penalty."

Scott's own version of events in his clemency testimony about the murder is hardly flattering. He admits to going to Alessi's house with Kondian planning a simple larceny. Kondian was to distract Alessi by engaging in homosexual sex with him while Scott searched the house for valuables. A fight then erupted between Kondian and Alessi, and Scott intervened to subdue Alessi. He broke a vase over Alessi's head while Kondian crashed a paperweight against Alessi's head several times. Kondian and Alessi were both bloody and naked. Scott then hit Alessi "over the back" with a chair, knocking Alessi to the ground. Scott cut electrical cords with a knife and tied Alessi to a chair, only to run out the screen door once Kondian began to crash a bottle over Alessi's head.

The Supreme Court of Florida found that "defense counsel, during the sentencing hearing, argued at length to the jury that Scott was not the major perpetrator in the murder of Alessi and that his participation in this capital crime was relatively minor." Indeed the record amply supports this finding. Scott did not, of course, present any evidence on the precise nature of the struggle with Alessi, such as he seeks to offer now.

Scott is essentially arguing that this evidence was not sufficiently mitigating to have offered at sentencing, and indeed may have risked inflaming the jury against him. But he now suggests that it would have been worthwhile to introduce this evidence, as it would have created a record which would preclude the death penalty *as a matter of law* under *Enmund.* In other words, before *Enmund* Scott was unaware of the full potential advantage from *his* account of the murder. Thus, according to Scott, *Enmund* was a substantial change in the law which justifies his failure to have produced this testimony and evidence at trial.

Scott's argument is flawed for two different reasons. First, *Enmund* did not make theretofore irrelevant mitigating evidence relevant. Second, the rule established by *Enmund* would not have worked to his advantage by precluding the death

penalty as a matter of law. The Court discusses this second conclusion *infra* in rejecting Scott's *Enmund* claim on the merits. In *Enmund,* the Court held that it violated the Eighth Amendment to impose the death penalty on a defendant convicted of felony murder, where the defendant did not himself intend to kill and only drove the getaway car for accomplices who murdered the occupants of a dwelling in an armed robbery.

In elaborating on the *Enmund* standard, however, the Court has held that the Eighth Amendment does not prevent the death penalty for a "non-triggerman" convicted of felony murder, where the defendant displayed reckless indifference for life. *Tison v. Arizona,* —— U.S. ——, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). "[W]e simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Id.* at 1688. Indeed, "[a]ctive participation in the murder vitiates the *Enmund* concerns." *Elledge v. Dugger,* 823 F.2d 1439, 1449 (11th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988).

Defense counsel argued to the jury that Scott was not the major participant in the crime, and that if there was any reasonable doubt in the jury's mind about whether Scott or Kondian did the killing, the death penalty was inappropriate. Scott obviously had every incentive to suggest that Kondian did the killing, and he took every opportunity afforded by the evidence at trial to make this point. While *Enmund* made minor participation a constitutional bar to the death penalty, it did not suddenly make minor participation a mitigating factor. Indeed, the Florida statute specifically provided as a mitigating factor where "the defendant was an accomplice in the offense for which he is to be sentenced, but the offense was committed by another person and the defendant's participation was relatively minor." Fla.Stat. sec. 921.141(6)(d).

The above analysis makes it clear that Scott has failed to demonstrate "cause" for his failure to adduce at trial evidence he now faults the Florida Supreme Court for refusing to consider. As cause and prejudice are the prerequisites to avoiding a state law procedural default, there is nothing improper about Florida's *Hallman* coram nobis standard.

#### o. Enmund claim

Scott claims that the *Enmund* decision precludes his death sentence as a matter of law. The Supreme Court recently summarized and defined the Eight Amendment limit on the execution of felony murders. "[W]e simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Tison,* 107 S.Ct. at 1688. The defendants in *Tison* delivered an arsenal of lethal weapons to two convicted murders during the course of a prison escape. After the successful jail-break, the defendants participated in the robbery and kidnapping of passing motorists, and stood by while one of the prison escapees murdered the innocent family. *Id.* at 1685.

While the Supreme Court did not decide *Enmund* until after Scott's direct appeal, the opinion was issued before Scott filed his state habeas petition and application for writ of error coram nobis in May, 1983. Scott did not directly raise the *Enmund* issue on the merits in his habeas petition. In the context of his coram nobis application, however, Scott did argue that "[w]ith Edmund [sic], the death penalty is barred because the testimony establishes that the petitioner did not kill the victim, did not attempt to kill the victim, did not intend that a killing take place, or that lethal force would be employed."

The Supreme Court of Florida did not mention the *Enmund* decision in its opinion rejecting his application for a writ of error coram nobis. The state, however, had argued in opposition to Scott's application that "the rule of the *Enmund* case clearly does not apply to the instant case." Furthermore, the state does not now argue that the *Enmund* issue is improperly before the Court on the merits. Indeed, the state once again has addressed the merits of Scott's *Enmund* claim in its response brief to this petition. The Court therefore finds Scott's *Enmund* claim to be properly before the Court on the merits.

"Under the felony-murder doctrine, a person who commits a felony is liable for *any* murder that occurs during the commission of that felony, regardless of whether he or she commits, attempts to commit, or intended to commit that murder." *Tison*, 107 S.Ct. 1689 (Brennan, J., dissenting). The *Enmund* issue, therefore, arises only when a defendant is convicted under a felony murder statute, because it is only in that instance that there is a question about the defendant's participation in the murder and his intent to kill. Where a defendant is convicted of premeditated murder, of course, the conviction itself affirms both the defendant's participation in the murder and his intent to kill.

In *Enmund*, defendant Enmund was clearly convicted under a felony murder theory, as the prosecutor conceded that the co-defendant committed the murder and that Enmund only drove the getaway car. 458 U.S. at 784–85, 102 S.Ct. at 3370. Likewise, in *Tison* the "capital murder charges were based on … felony murder law providing that a killing occurring during the perpetration of robbery or kidnapping is capital murder … and that each participant … is legally responsible for the acts of his accomplices." *Tison*, 107 S.Ct. 1676.

■ But where there is doubt as to the basis of the conviction and the sentence, an *Enmund* analysis is also appropriate. In *Cabana v. Bullock*, 474 U.S. 376, 383 n. 2, 106 S.Ct. 689, 695 n. 2, 88 L.Ed.2d 704 (1986) (overruled on other grounds in *Pope v. Illinois*, —— U.S. ——, 107 S.Ct. 1918, 1922 n. 7, 95 L.Ed.2d 439 (1987)), the trial court instructed the jury on both felony murder and premeditated murder, and the Court was of the "view that the jury's

verdict does not necessarily reflect a finding that [the defendant] killed."

"Thus, the jury may well have sentenced [the defendant] to death despite concluding that he had neither killed nor intended to kill; or it may have reached its decision without ever coming to any conclusion whatever on those questions." *Cabana*, 474 U.S. at 384, 106 S.Ct. at 696. Indeed, such uncertainty is inherent in a general verdict where both premeditated and felony murder instructions are given. "A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Id.* at 383 n. 2, 106 S.Ct. at 695 n. 2.

Scott correctly notes that in his case "[h]aving returned a general verdict of guilty of first degree murder, the state of the record is silent as to which theory the jury based its verdict." This would seem to require an *Enmund* analysis because, as in *Cabana*, the jury may have based its verdict on felony murder. In Florida, however, the trial court has final and ultimate responsibility for sentencing the defendant. While this raises the question of whether the trial court's own finding of premeditation can render an *Enmund* analysis unnecessary, as the trial court did not make such a finding this issue need not be decided.[5]

The trial court's sentencing order does not unmistakably indicate that it found Scott to have committed Alessi's murder by premeditation instead of as a felony murder. In discussing the mitigating evidence, the trial court stated that "there is no evidence that the defendant's participation in this crime was that of an accomplice *and* his participation was relatively minor."

---

**5.** The Eleventh Circuit has relied upon a trial court's finding that the defendant had a "premeditated design to kill" in order to find satisfied *Cabana's* requirement that the state courts *themselves* make a determination of the defendant's culpability. *Cooper v. Wainwright*, 807 F.2d 881, 885 n. 12 (11th Cir.1986). While the distinction may only be semantic, the *Cooper* court did not rely upon this finding to conclude that an *Enmund* analysis was unnecessary. Instead, the *Cooper* court held that this finding satisfied *Enmund.*

In *Smith v. Dugger*, 840 F.2d 787, 793 (11th Cir.1988), the trial court had instructed the jury

on both felony and premeditated murder. The *Smith* court noted the Supreme Court of Florida's conclusion that "it was *unnecessary* to make the *Enmund* finding called for in felony murder cases because 'here there was sufficient evidence from which the jury could have found appellant guilty of premeditated murder.'" *Smith*, 840 F.2d at 793 (emphasis added). The *Smith* court also initially had analyzed the trial court's finding that the defendant committed premeditated murder, apparently assuming that such a finding would render an *Enmund* analysis either unnecessary or satisfied.

The trial court was analyzing Fla.Stat. sec. 921.141(6)(d), which creates a statutory mitigating factor where "[t]he defendant was an accomplice in the capital felony committed *by another person* and his participation was relatively minor." (emphasis added).

One interpretation of the trial court's rejection of section 921.141(6)(d) as a mitigating factor is that the court found it to be inapplicable because Scott himself committed the murder. But an equally tenable interpretation is that by accenting the "and" in the statute, the court merely rejected a finding that Scott was a minor participant. At the very minimum, the court's sentencing order was hardly as definitive on this point as was the order in *Cooper v. Wainwright,* 807 F.2d 881, 885 n. 12, *cert. denied,* — U.S. —, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987), where the trial court flatly concluded that the defendant had a "premeditated design to kill." As the trial court's sentencing order does not itself resolve this ambiguity, and it is perfectly consistent with felony murder, the Court finds that an *Enmund* analysis is necessary because Scott's conviction and sentence may have been based on felony murder.

The state courts must themselves make the factual findings that the defendant played a major role in the felony and that he displayed a reckless disregard for life.[6] *Tison,* 107 S.Ct. at 1688. A federal habeas court "must examine the entire course of the state-court proceedings against the defendant in order to determine whether, *at some point in the process,* the requisite factual finding as to the defendant's culpability has been made." *Cabana,* 474 U.S. at 387, 106 S.Ct. at 697 (emphasis added). Where the record fails to indicate that this finding was made, however, "the federal court [must] take steps to require the State's own judicial system to make the factual findings in the first instance." *Id.* at 390, 106 S.Ct. at 699.

A state appellate court may make this finding, although there are special concerns about the adequacy of appellate

court fact-finding under 28 U.S.C. sec. 2254(d)(2). *Cabana,* 474 U.S. at 388 n. 5, 106 S.Ct. at 698 n. 5. On direct appeal, the Supreme Court of Florida rejected Scott's contention that the evidence did not support premeditation, finding that "[t]he manner in which the victim was murdered in itself evidences premeditation." *Scott,* 411 So.2d at 868. Furthermore the court found that "Scott and Kondian made a definite statement preceding the murder of their plans to rob and to kill Alessi." *Id.* In the recent Rule 3.850 proceedings, the court again found that "[o]n the evening of the murder, according to Charles Soutullo, Scott and his co-perpetrator, Richard Kondian, told Soutullo of their plan to rob and kill Alessi, and invited Soutullo to join them." *Scott,* 513 So.2d at 654. The issue, then, is whether these findings are adequate for purposes of *Cabana* to sustain Scott's death sentence.

 The jury was instructed on both felony and premeditated murder. On direct appeal, the Supreme Court of Florida found both instructions to be supported by the evidence, and it is in this context that the court made its finding that the murder "evidences" premeditation. A defendant charged with a serious crime has a well-established right to have a jury determine his guilt or innocence. *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). But "[t]he decision whether a particular punishment—even the death penalty—is appropriate in any given case is not one that we have ever required to be made by a jury." *Cabana,* 474 U.S. at 385, 106 S.Ct. at 697. A jury need not make the required *Enmund* culpability finding because it "does not concern the guilt or innocence of the defendant—it establishes no new elements of the crime of murder...." Consequently, a trial or appellate court may make findings relevant to a defendant's sentence, and may even "supply essential findings that the jury has omitted." *Id.* at 387 n. 4, 106 S.Ct. at 697 n. 4.

---

6. The Eighth Amendment, however, is satisfied if a federal habeas court conducts an independent examination of the record regarding the defendant's culpability. The requirement that state courts themselves first be given this opportunity flows from considerations of federalism and comity. *Cabana,* 474 U.S. at 382–83 n. 1, 106 S.Ct. at 695 n. 1.

The Supreme Court of Florida did not make its premeditation findings merely for the purpose of establishing that Scott had the necessary culpability to be *sentenced* to death for felony murder. Rather, the court made both of its premeditation findings in the context of addressing the basis of Scott's *conviction*, not his sentence. Nothing in *Cabana* authorizes courts to make a definitive statement as to the actual basis of the defendant's conviction where the jury renders a general verdict in this context. The Supreme Court of Florida made such a statement, although the jury returned only a general verdict.

Nonetheless, this finding is sufficient to satisfy the *Enmund* culpability requirement for sentencing purposes.[7] In *Smith v. Dugger*, 840 F.2d 787 (11th Cir.1988), the court relied upon a very similar conclusion of the Supreme Court of Florida in a case where the jury was charged on both premeditated and felony murder. The *Smith* court found *Enmund* to be satisfied by the Florida court's finding that "here there was sufficient evidence from which the jury could have found appellant guilty of premeditated murder." *Id.* at 793. In *Smith*, the Supreme Court of Florida expressly concluded that its finding of premeditation rendered an *Enmund* analysis "unnecessary" because *Enmund* applies only to felony murder convictions.[8] *Id.*

▆▆ The *Smith* court, in an *Enmund* sentencing challenge, used a premeditation finding made by a state appellate court on direct appeal concerning the sufficiency of the evidence for a conviction. This is the exact same context in which the Supreme Court of Florida made its premeditation finding in this case. Thus, the Eleventh Circuit has specifically endorsed and relied upon this type finding to satisfy *Enmund*. This Court finds that the Supreme Court of Florida's premeditation finding was, if not explicitly, at the very least an implicit assessment of Scott's culpability; i.e., that Scott was a major participant in the felony and that he displayed a reckless disregard for life. This finding satisfies *Enmund*.[9]

Furthermore, the Court notes that the Supreme Court of Florida has specifically accepted and relied upon Scott's own account of the murder at his clemency hearing. The Supreme Court of Florida relied upon this testimony in its recent opinion rejecting ineffective assistance of trial counsel. *See Scott* 513 So.2d at 655 n. *. Consequently, this satisfies *Cabana's* requirement that the state courts themselves first be afforded an opportunity to address the defendant's *Enmund* culpability.

Scott has admitted that he and Kondian went to Alessi's home in order to rob him. While Kondian distracted Alessi by engaging in homosexual sex with him on the couch, Scott searched through the house looking for valuables. After Alessi and Kondian began fighting, Scott interceded and smashed a vase over Alessi's head.

---

7. This does not mean that Scott's conviction for first degree murder is in any way tainted, because a properly charged jury rendered that verdict. It only means that where the jury renders a general verdict, the actual rationale for conviction is uncertain. *See infra* note 9 regarding *Stromberg* analysis.

8. The Eleventh Circuit in *Smith* did not expressly adopt the Supreme Court of Florida's reasoning that an *Enmund* analysis was "unnecessary." Instead, the Eleventh Circuit found the *Enmund* culpability standard to be satisfied. Consequently, the court did not have reason to address the Sixth Amendment concerns raised by an appellate court's definitive statement regarding the basis of conviction on a general verdict.

9. There is no tension with the doctrine established by the case of *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), as it applies only to a jury's general verdict on conviction, not sentencing. The relevant "rule derived from the *Stromberg* case is that a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant*, 462 U.S. at 881, 103 S.Ct. at 2745. The Court, however, has already rejected Scott's argument that either the premeditation charge or the felony murder charge was constitutionally insufficient on the basis of the evidence in the case. *See supra* Conviction Claims b & c. Nothing in *Stromberg* or its progeny prohibits an appellate court from making factual findings for purposes of sentencing, although the jury has rendered a general verdict. Indeed the Supreme Court in *Cabana* requires that state courts be afforded the opportunity to make these "omitted" findings.

This intervention began to turn the tide of the fight, as Alessi had been winning the struggle.

Kondian was "severely" crashing a paperweight against Alessi's head, although Alessi had again gained control and was smashing Kondian against the wall. Scott then picked up a chair and hit Alessi over the back, knocking him down. Scott used a knife to cut electrical cords and tie Alessi to a chair while Kondian kept him at bay using a broken bottle. Kondian then became enraged and beat Alessi over the head with the bottle, while Scott ran out the patio door.

This description of Alessi's murder unquestionably establishes that Scott played a major role in the beating death of Alessi. Indeed, without Scott's help Alessi probably would have escaped Kondian's attack. Furthermore, Scott displayed a reckless disregard for Alessi's life by battering him across the head and back with a vase and chair, and then tying him to a chair. Finally, Scott admittedly simply ran away when Kondian began administering the final blows. Scott's clemency testimony and the Supreme Court of Florida's reliance upon it obviates the need for an extensive analysis of Charles Soutullo's credibility.[10]

In summary, the *Tison* decision holds that in order for the Eight Amendment *Enmund* standard to be satisfied, the state courts must themselves find that the defendant was a major participant in the felony and that he displayed a reckless disregard for life. The Supreme Court of Florida relied upon Scott's clemency testi-mony as a basis for rejecting his claim of ineffective assistance of trial counsel. This sufficiently incorporates Scott's testimony as appellate court factfinding for purposes of *Tison*, and establishes that Scott is sufficiently culpable to be executed. Scott himself supplied his clemency testimony to the Supreme Court of Florida in his state habeas appeal.

Finally, the Supreme Court of Florida's finding that Scott committed a premeditated murder, as in the *Smith* decision, is at least an implicit finding of Scott's culpability which is adequate to satisfy *Enmund*. For sentencing purposes, it satisfies the standard for felony murder executions established in *Enmund* and its progeny. Describing the circumstances of the murder, the court found that "[t]here was a long bloody chase throughout the house, the victim was badly beaten, his hands and feet were tied while he was alive, and he was struck on the head six times with a blunt instrument." *Scott*, 411 So.2d at 868. As the greater includes the lesser in this context, the court's finding of premeditation based upon these facts also includes a finding that Scott displayed a reckless disregard for Alessi's life, and that he was a major participant in the felony.

p. Multi-underlying felony theory

Scott repeats his theory that he was improperly prosecuted under a so-called multi-underlying felony theory. This claim is completely duplicative of that made in his conviction claim h, *supra*, and the Court rejects it for the reasons stated therein.

---

10. Scott's clemency testimony independently satisfies *Enmund*. As to the premeditation issue, the *Cabana* Court noted that appellate factfinding is suspect when "the question whether the defendant killed, attempted to kill, or intended to kill might in a given case turn on credibility determinations that could not be accurately made by an appellate court on the basis of a paper record." *Cabana*, 474 U.S. at 388 n. 5, 106 S.Ct. at 698 n. 5. The *Cabana* Court cited the case of *Ross v. Kemp*, 756 F.2d 1483 (11th Cir.1985) (en banc), as an example of an appellate court's adequate fact-finding. *Cabana*, 474 U.S. at 388 n. 5, 106 S.Ct. at 698 n. 5. The *Cabana* Court described the *Ross* decision as resolving the *Enmund* issue adversely to the defendant although credibility issues and other ambiguities were taken in the light most favor-able to the defendant. *Cabana*, 474 U.S. at 388 n. 5, 106 S.Ct. at 698 n. 5.

As stated by the Supreme Court of Florida, the critical evidence of premeditation in this case came by way of Soutullo. As part of his claim for ineffective assistance of trial counsel, *infra* in the text, Scott argues that his counsel was ineffective because he did not locate and present witnesses who would have impeached Soutullo's veracity. Indeed, in rejecting the ineffectiveness claim, the Supreme Court of Florida concluded that "the jury was adequately apprised of Soutullo's character, reputation for dishonesty and his past crimes." *Scott*, 513 So. 2d at 655. Soutullo was also charged with Alessi's murder and he admitted on cross-examination that the police had told him his assistance in Scott's prosecution would be to his benefit.

### q. Ex parte materials

Scott claims that the Supreme Court of Florida has an unconstitutional practice of reviewing ex parte information. Other than his challenge to his clemency testimony discussed *infra*, however, he fails to identify any such information allegedly used by the court in his case. In any event, this circuit has accepted the Supreme Court of Florida's statement and position that it does not use such materials. *Ford v. Strickland*, 696 F.2d 804 (11th Cir.) (en banc), *cert. denied*, 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983).

### r. Automatic aggravating circumstance

Scott evidently challenges Florida's statutory aggravating factor 921.-141(5)(d), whereby the trial court found that "[t]he capital felony of which the defendant was found guilty was committed while he was engaged or was an accomplice in the commission of, or an attempt to commit, robbery and/or burglary." Scott contends that this amounts to an automatic aggravating circumstance. The Court in *Lowenfield v. Phelps*, — U.S. —, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), upheld a conviction under Louisiana's capital sentencing statute although the same factor formed the basis of both the conviction and the only aggravating circumstance.

The *Lowenfield* Court stated that "[t]he use of 'aggravating circumstances,' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion." *Id.* at 554. As the trial court found four statutory aggravating factors in addition to the one Scott complains of, there is no reasonable argument that he was automatically sentenced to die because he committed felony murder. *See Blanco v. Dugger*, Case No. 87–6685–Civ–HASTINGS (S.D.Fla. April 27, 1988) at 15.

### Ineffective Assistance of Trial Counsel

On December 11, 1988 Scott filed an amendment to his petition in order to reflect events during the stay previously entered by the Court in 1984. Scott added a claim of ineffective assistance of trial counsel, and also a claim that the Supreme Court of Florida improperly considered extra-record matters. These claims are inextricably linked, as the court, in rejecting Scott's claim of ineffectiveness, relied in part upon Scott's testimony before the Florida Probation and Parole Commission at his clemency hearing. The Court therefore considers the clemency testimony first.

In a footnote to its opinion, the Supreme Court of Florida noted that "Scott himself in his clemency hearing testified that, the night of the murder, Kondian deliberately engaged in sex with Alessi so that Scott could rummage through the house for things to steal." *Scott*, 513 So.2d at 655 n. *. The state attached a transcript of Scott's clemency hearing to its pleadings before the court on Scott's Rule 3.850 motion. Scott had moved unsuccessfully to strike this appendix. Scott claims prejudice because the state did not introduce this transcript in his trial court Rule 3.850 hearing, thereby depriving him of the opportunity to object "on several grounds, including relevance and voluntariness."

Scott's challenge to the Supreme Court of Florida's consideration of his clemency testimony is frivolous. In his application for leave to file petition for writ of error coram nobis *filed with the Supreme Court of Florida* on May 31, 31, 1983, Scott *himself* attached as an appendix a transcript of his clemency proceedings. Furthermore, Scott made extensive reference to this testimony in this petition for habeas corpus. He can claim no unfair prejudice simply because the state was subsequently able to argue successfully that this same testimony worked against Scott's claim of ineffective assistance of trial counsel.

Scott now claims that his trial counsel was ineffective because he failed to investigate and present a "defense of others" defense, and because he failed to discover and present witness who would have testified as to the state's lead witness, Soutullo, lack of credibility. As summarized above in Scott's Conviction Claim k, *supra*, a petitioner alleging ineffective assistance of counsel must meet the two-part test of *Strickland v. Washington*, 466 U.S. 668,

104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He must show that counsel's performance was substantially and seriously deficient, and also that this deficiency "undermine[s] confidence in the outcome."

■ Scott's claim of ineffectiveness rests largely on trial counsel Barrs' failure to investigate and present a defense that the victim Alessi attempted to rape Kondian and that Scott merely came to his friend's defense. Barrs' trial defense was that there was insufficient evidence to place Scott inside Alessi's home at the time of the murder, and that Kondian was the murderer. A criminal defense attorney has a duty to make a reasonable investigation, although "[u]nder some circumstances an attorney may make a strategic choice not to conduct a particular investigation." *Armstrong v. Dugger,* 833 F.2d 1430 (11th Cir.1987).

■ The ineffectiveness allegedly results from Barrs' failure to investigate and present witnesses and evidence to support this alternative defense. Related to this is Barrs' alleged failure to cross-examine adequately the state's medical examiner Dr. Cuevas. Scott contends that Barrs ineffectively failed to establish that the sperm found on Alessi's body was probably the result of sexual activity. This logically would support Scott's rape/defense of others theory.

But under *Strickland,* any alleged ineffectiveness must undermine confidence in Scott's conviction or sentence. As noted by the Supreme Court Florida, Scott admitted in his clemency testimony that Kondian *voluntarily* engaged in sex with Alessi so that Scott could look through the house for things to steal. Given this admission, Scott's claim of ineffective assistance of trial counsel is hypothetical. He cannot demonstrate that confidence in the result of his conviction and/or sentence is undermined simply because defense counsel did not present and argue an *admittedly false* theory of defense.

Scott's present rape/defense of others theory is flatly inconsistent with his clemency testimony. In *Zamora v. Dugger,* 834 F.2d 956 (11th Cir.1987), the court rejected a petitioner's claim of ineffective assistance of trial counsel. The petitioner claimed ineffective assistance because trial counsel did not object to the introduction at trial of the petitioner's confessions under *Miranda.* But the court found that the petitioner was not prejudiced by any alleged ineffectiveness, because he had written a subsequent letter to a friend admitting to the murder. As in the *Zamora* case, Scott has admitted to facts which demonstrate that he is not prejudiced by any alleged ineffectiveness.

■ Scott also claims that Barrs was constitutionally ineffective by not properly impeaching the state's key witness, Soutullo. Soutullo testified that Kondian and Scott informed him of their plan to rob and murder Alessi. The Supreme Court of Florida concluded that "the jury was adequately apprised of Soutullo's character, reputation for dishonesty and his past crimes." In support of this conclusion, the state now argues that "additional evidence of Soutullo's dishonesty and drug use would merely have been cumulative."

At the Rule 3.850 hearing, Kondian's attorney David Roth testified that he had investigated Kondian's background, and that he knew of individuals who would testify that Soutullo could not be believed under oath. Barrs did not present any witnesses to impeach Soutullo's veracity. At trial, Soutullo testified that he had been convicted of grand larceny in California and that there was an outstanding warrant for his arrest. He also said that he did not go along with the plan to rob and murder Alessi simply because he thought the outstanding warrant made him more vulnerable.

Soutullo admitted that he and Kondian had shot up with speed earlier on the day Kondian approached him about the murder plan. He also acknowledged that he lied to the police when first questioned by the police, by denying that he knew Kondian's accomplice. Soutullo testified that after speaking with the police, he was arrested by the Broward County Police Department for five separate felony charges, three of which were dropped. Thus, the Supreme Court of Florida was amply justified in

concluding that "the jury was adequately apprised of Soutullo's character, reputation for dishonesty and his past crimes." *Scott,* 513 So.2d at 655. In short, the Court finds no merit to Scott's claim of ineffective assistance of trial counsel.

In conclusion, the Court has considered and rejected each separate and discrete claim or issue raised by Scott in this petition. To the extent the Court has not specifically discussed and rejected any particular claim or issue, however, this Order is also a ruling on the merits rejecting any basis for habeas corpus relief, whether or not otherwise specifically identified in this Order.